UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

DOSTER LIGHTING, INC.
on behalf of itself and all
others similarly situated,

          Plaintiff,

      v.                           Case No.  12-C-0023

E-CONOLIGHT LLC,

          Defendant.

DECISION REGARDING MOTION FOR CLASS CERTIFICATION
AND ORDER GRANTING MOTION FOR RECONSIDERATION (DOC. 68)
BUT MAINTAINING DECISION

Presently before the court is Doster Lighting, Inc.'s motion for class certification. Previously, the court indicated that the motion was denied.  The reasoning underlying the decision is set forth below.  Because new caselaw issued after the court's decision was announced, Doster moved for reconsideration.  As a result, the court will grant the motion for reconsideration and take into account the new cases and argument presented by the parties.  However, upon reconsideration the court's denial of the motion for class certification stands.

This case is about allegedly defective LED bulb arrays and fixtures[1] and how E-Conolight dealt with the failure of some of those items.  E-Conolight manufactures certain LED arrays and fixtures as identified in the First Amended Complaint and motion for class certification (the "LED products")—e.g., floodlights and ceiling mounted lighting—and sold those LED products to Doster and other customers.  E-Conolight began

_____

[1](LED arrays are the lamps; fixtures constitute the housings into which the lamps fit.  (*See* Doc. 33 at 5.))

selling the LED products in September 2010. E-Conolight's catalogs represented that all of its LED products would provide a minimum of 50,000 hours of maintenance-free operation, that certain floodlights had "tough construction," that other floodlights had "durable construction," and that LED ceiling mounts were "built to last." (*See, e.g.*, Doc. 32 Ex. E at 494–98, Ex. F at 40-42; *see* Doc. 33 at 3.) E-Conolight recognizes that 50,000 hours of maintenance-free performance is typical in the industry. (Doc. 32 Ex. A at 41-43.) At all pertinent times, E-Conolight's website and each of its catalogs contained the same warranty language:

> HID and fluorescent lamps come with a one-year warranty. Quartz halogen lamps come with a 90-day warranty. Fixture warranties are shown with each product.
>
> This warranty excludes field labor/service charges related to the repair/replacement of e-conolight products and also those e-conolight products installed in corrosive environments. E-Conolight reserves the right to change the warranty period without prior notice and without incurring obligation and expressly disclaims all warranties not stated in this limited warranty.

(Doc. 32 Ex. F at 75.) The individual pages of the catalogs and website displaying the LED products stated "three-year warranty." (E.g., Doc. 32 Ex. F at 39–43.)

Doster was one of E-Conolight's first customers of LED products, making its first purchase of such products on or about September 17, 2010. (Doc. 43, ¶ 17.) By April 8, 2011, Doster had purchased 166 of the LED products.

"It is undisputed that some of the LED products did not perform as anticipated." (Doc. 41 at 4.) Beginning in January 2011, Doster, among other customers, experienced failure of some of the LED products within a relatively short time after purchase. On April 15, 2011, Doster reported to E-Conolight that three fixtures were turning off after

2

about a minute and would not power back on.  On April 25, 2011, Doster reported that eight more fixtures were failing after about an hour.  (Doc. 43, ¶¶ 18–19; Doc. 44 Ex. 6.) E-Conolight responded by replacing fifteen fixtures that Doster had installed.  When Doster returned the fixtures to E-Conolight, E-Conolight began testing the fixtures to determine the cause of the problem.   Also, E-Conolight reimbursed Doster its requested labor reimbursement costs of $1235.  (Doc. 44 Exs. 9, 10; Doc. 43, ¶ 21.)

By mid-May 2011, E-Conolight tested sixteen LED products and found that seven failed, yet it continued selling the products.  E-Conolight shipped Doster and others replacement products, but some of those failed, too.  E-Conolight investigated the problem and by the end of May 2011, hypothesized that the defect was caused by sulfur contamination causing the silver in the LED arrays to tarnish.  (*See* Doc. 32 Ex. B; Doc. 44 Exs. 19–21.)  By June or July 2011, E-Conolight determined that a gasket in the LED products was the source of the sulphur gas.  (Doc. 32 Ex. C; Doc. 44 Exs. 20–21.)

Meanwhile, on June 20, 2011, Doster contacted E-Conolight and stated that two of its fifteen replacement fixtures were not lighting.  (See Doc. 43, ¶ 22.)  E-Conolight shipped two replacement fixtures.  (*Id.* ¶ 23.)  On June 27, 2011, Doster sent E-Conolight an email saying that more fixtures were not working.  (Doc. 44 Ex. 23.)

In July 2011, E-Conolight retrofitted the LED arrays it had in stock by disassembling each fixture, washing it, and replacing the gaskets and arrays.  (*See* Doc. 44 Ex. 26.) E-Conolight shipped 166 reworked fixtures to Doster in late August and early September 2011.  It offered Doster additional compensation of $40 per fixture (i.e., $6640 for the 166 fixtures).  (Doc. 44 Ex. 36.)  However, Doster rejected the offer.  (Doc. 44 Ex. 37.)  In

3

October 2011, Doster demanded a refund and labor costs of $156 per fixture for at least two more replacements.  (Doc. 44 Ex. 39.)

E-Conolight stopped selling the LED products as of August 30, 2011.   Between September 2010 and August 2011, approximately 4065 customers located in all fifty states and the District of Columbia had purchased 32,402 of the LED products from E-Conolight. (*See* Doc. 32 Ex. Q ¶ 7, Ex. Q5; Doc. 33 at 6-7; Doc. 43 ¶ 14.)  According to E-Conolight, since the fixtures were re-worked in August 2011, the problem has been resolved. (*See* Doc. 41 at 10.)

From September through October 2011, E-Conolight, in Wisconsin, re-worked its existing LED products and used those re-worked products to replace LED products that failed.  No new LED products were sold from October 2011 to June 2012, when production resumed.   Of the 32,402 LED products shipped during the class period, E-Conolight replaced 14,085 with reworked LED products. (*See* Doc. 32 Ex. HH.)  However, according to E-Conolight, customers reported 9705 fixtures as experiencing problems.  Re-worked products were supplied by E-Conolight to all customers who complained. (*See* Doc. 43 Ex. 3; Doc. 41 at 10–11.)  Not all of the bulbs with the original gasket had failed, yet E- Conolight replaced all the fixtures purchased by a particular customer even if only a few of that customer's products had experienced problems. (*See* Doc. 41 at 5.)  All told, the percentage rate for products shipped through August 2011 that did not perform was about 29%. (*See* Doc. 41 at 5; Doc. 43, ¶ 7.)

E-Conolight developed a written policy as to the circumstances in which it would pay for labor or other costs incurred by customers in removing and replacing the defective LED products:  the customer service representative would not raise the issue of reimbursement

4

of labor costs, but if a customer brought it up, the customer service representative would state that labor reimbursement was not covered by the warranty; however, if the customer persisted, the representative would discuss payment of labor reimbursement at $40 per LED product. (Doc. 32 Ex. T at 92, 96–98.) This labor reimbursement was for customers who accepted replacement products; E-Conolight did not give a refund and pay labor reimbursement, though it did so for one customer. (Doc. 32 Ex. PP at 3.)

E-Conolight acknowledges that its original LED products contained the troublesome gasket. After determining the cause of the problems, E-Conolight sent replacement bulbs to many customers, though it did not offer to pay for the labor or other costs of replacement. Nevertheless, if a customer asked for reimbursement of replacement costs, E-Conolight often paid the customer something, sometimes $40 per LED product.

Doster, on behalf of itself and a potential class, sues E-Conolight for violation of the Magnuson-Moss Warranty Act (MMWA), breach of the implied warranty of merchantability, violation of Wisconsin's deceptive trade practices act, and a declaration that E-Conolight's purported disclaimer of warranties and limitation on consequential damages does not apply to the implied warranty of merchantability for the re-worked replacements that Doster and many class members received. Doster seeks damages for new LED products plus the costs of replacing them. (*See* Doc. 33 at 2.)

Doster seeks certification of the following class:

> All residents (individuals, corporations, partnerships, and all legal entities) of the United States (the fifty states, and the District of Columbia) who, from January 1, 2010, through August 30, 2011,[2] purchased directly from Defendant and Defendant shipped LED Products (1) Defendant's LED

---

[2] Doster's motion provided the date of August 30, 2012, but its brief provides the date of August 30, 2011, which corresponds with the end-date of E-Conolight's LED product sales.

Roundback Floodlights/Spotlights, catalog numbers E-HL2F05C2Z, E-HL2S05C2Z, E-HL2F06C2Z, E-HL2S06C2Z, E-HL2F06N2Z, and E-HL2S06N2Z, (2) Defendant's LED Directional Floodlights/Spotlights, catalog numbers E-GL2F02C2K&W, E-GL2S02C2K&W, E-GL2F03C2K&W, E-GL2S03C2K&W, E-GL2F03N2K&W, and E-GLS03N2K&W, or (3) Defendant's LED Ceiling Mount fixtures, catalog numbers E-CC2L02CZ, E-CC2L03CW, E-CC2L03CZ, E-CC2L03NW, and E-CC3L03NZ.

Excluded from the Class are Defendant, as well as all employees of this Court, including, but not limited to, Judges, Magistrate Judges, clerks and court staff and personnel of the United States District Court for the Eastern District of Wisconsin, of the United States Court of Appeal for the Seventh Circuit and of the United States Supreme Court; their spouses and any minor children living in their households and other third persons within a third degree of relationship to any such Federal Judge; and, finally, the entire jury venire called for jury service in relation to this lawsuit.

Doster seeks certification of this class for liability and damages.

A plaintiff seeking class certification bears the burden of satisfying the four requirements of Fed. R. Civ. P. 23(a) and one of the subsections of Fed. R. Civ. P. 23(b). Fed. R. Civ. P. 23; *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ___, 131 S. Ct. 2541, 2548 (2011). Under subsection (a), to obtain class certification Doster must show that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) its claims or defenses are typical of the claims or defenses of the class; and (4) it will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Doster seeks certification under subsection (b)(3), which requires that it also establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

6

The district court has broad discretion in determining whether class certification is appropriate. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). The court's analysis must be rigorous. *Wal-Mart Stores,* 131 S. Ct. at 2551. Rule 23 is not merely a pleading standard; the court should probe beyond the allegations in the complaint as necessary. *Comcast Corp. v. Behrend*, 569 U.S. ___, 133 S. Ct. 1426, 1432 (2013). The named plaintiff must prove affirmatively (with evidence) the Rule 23 requirements. *Id.* The court's analysis may entail some overlap with the merits of the claims, though the merits are considered only to the extent relevant to the class-certification issue. *Wal-Mart Stores*, 131 S. Ct. at 2551–52.

Doster argues that the existence of a defect in the LED products causing them not to be merchantable and as represented constitutes a predominating common issue and that its declaratory action presents exclusively common legal issues based on statutory and contractual interpretation. (Doc. 33 at 2.)

A.    Rule 23(a)

1.    Numerosity

Rule 23(a)(1) dictates that a proposed class be so numerous that joinder is impractical. Here, the numerosity requirement is met easily. The proposed class consists of 4065 customers. Joinder of that many plaintiffs in one case would be impractical. The Seventh Circuit has said that a group as small as forty may satisfy the numerosity requirement. *See Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969).

E-Conolight argues that Doster has failed to identify which proposed class members have experienced problems with their fixtures or which proposed members failed to receive

7

the benefit of E-Conolight's warranty. Conversely, E-Conolight contends that Doster cannot proceed on a speculative claim that a product might theoretically fail in the future. Moreover, E-Conolight submits Doster can identify only four individuals who experienced a problem with their fixtures and were unsatisfied with E-Conolight's remedy. (Doc. 41 at 46.)

That a proposed class member's LED products did not fail does not mean that that party was not injured. Paying more for a product than its value with a defect constitutes a cognizable financial injury. *See Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012) ("*Butler I*"), *cert. granted and judgment vacated*, 133 S. Ct. 2768 (2013), *opinion reinstated by* 727 F.3d 796, 802 (7th Cir. 2013) ("*Butler II*"), *cert. denied*, 134 S. Ct. 1277 (2014); *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 750–51 (7th Cir. 2011). "[T]here is a distinction 'between class members who *were not* harmed and those who *could not* have been harmed.'" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014) (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 825 (7th Cir. 2012)). Further, that some proposed class members were satisfied with replacement by E-Conolight does not mean that they did not suffer consequential damages. Thus, numerosity is met.

2.    Commonality

Rule 23(a)(2) next requires that there be "questions of law or fact common to the class." Commonality requires a contention capable of class-wide resolution, meaning "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 131 S. Ct. at 2551. What matters is not

8

the raising of common questions but "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.*

Even a single common question will satisfy the commonality requirement. *Id.* at 2556; *Suchanek*, 764 F.3d at 755. Not every question need be common. *Id.* at 756. The common question can be one of law or fact. Fed. R. Civ. P. 23(a)(2). However, commonality requires more than all class members suffered a violation of the same provision of law. *Wal-Mart Stores*, 131 S. Ct. at 2551[3]; *Suchanek*, 764 F.3d at 755.

Common questions often arise where defendants engaged in standardized conduct towards members of the proposed class. *See Suchanek*, 764 F.3d at 756; *Keele*, 149 F.3d at 594. "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek*, 764 F.3d at 756.

In *Suchanek*, the plaintiffs sought to certify a class representing consumers, from eight states, who had purchased the defendants' coffee pods. *Id.* at 754–55. The Seventh Circuit held that the proposed class members' claims derived from a single course of conduct by the defendant: the marketing and packaging of its coffee pods. *Id.* at 756. Further, the defendant admitted that all of the applicable state consumer protection laws required proof that a statement was either literally false or likely to mislead a reasonable consumer. *Id.* Whether the product's packaging was likely to deceive a reasonable consumer was a common question. *Id.* at 757.

---

[3]In *Wal-Mart Stores*, the Supreme Court found no commonality existed for the purported nationwide class of female employees asserting sex discrimination because there was no proof of a companywide discriminatory pay or promotion policy. *See* 131 S. Ct. at 2556–57.

9

In *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010)*,* two plaintiffs brought class actions alleging that their vehicles had an alignment defect that caused premature tire wear and gave the vehicles a rough ride. The vehicles had the same warranty. Land Rover had begun to cover the costs of temporary fixes for the defect, but did not offer full reimbursement. *Id.* at 1170–71. One plaintiff had filed a class action on behalf of Land Rover purchasers in Michigan and one filed a class action on behalf of Land Rover purchasers in Florida. The lawsuits charged that Land Rover knew of the defect yet continued to sell the vehicles without disclosing the defect's existence, breached its warranties by failing to cover the entire cost of repair and replacement tires, breached express and implied warranties, and violated consumer protection laws. *Id.* at 1171. The court found that the plaintiffs easily satisfied the commonality requirement because the claims of all prospective class members involved the same alleged vehicle defect, the same warranty, and the same vehicle make and model. *Id.* at 1172. Identical manifestation of a defect was not required; the allegation that a defect existed was susceptible to proof by common evidence. Whether other facts may have affected tire wear did not affect whether the vehicles were sold with an alignment defect. *Id.* at 1173–74.

A few years back, Eastern District of Wisconsin Judge Lynn Adelman dealt with a putative class action asserting breach of express warranty for failure of gas-filled windows to retain their gas. Judge Adelman found that the commonality requirement was "easily met" when class members bought the same products in reliance on the same disclosures or with receipt of the same standard warranty made by the same party. *Barden v. Hurd*

10

*Millwork Co.*, 249 F.R.D. 316, 319 (E.D. Wis. 2008). In that case, Hurd did not dispute that the windows did not retain the inert gas filling. *Id.* at 319.

Here, common issues exist, for instance whether the LED products contained a defect and whether E-Conolight's written warranty language applies to its LED products. E-Conolight acted in a standardized manner toward the proposed class members regarding its sale of the LED products in a certain condition. Hence, the commonality requirement is met.

      3.      Typicality

A named plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Oshana*, 472 F.3d at 514 (internal quotation marks omitted). The purpose of the requirement is to assure that the interest of the named representative aligns with the interests of the class. *Wolin*, 617 F.3d at 1175. Typicality can be established despite different factual circumstances regarding manifestation of a defect. *Id.*

Here, the typicality requirement is met. Doster's warranty breach of warranty claims arise from the same course of conduct by E-Conolight—sale of LED products containing a sulphur-emitting gasket. Doster's declaratory judgment claims arise from the same written warranty language used by E-Conolight for all of its LED products. And Doster's deceptive practices claims arise from the same conduct of E-Conolight regarding how it sold and handled the defect in the LED products.

11

4.      Adequacy of Representation

Rule 23(a)(4) requires Doster to show that it "will fairly and adequately protect the interests of the class."  A plaintiff must show that:  "(1) the representative does not have conflicting or antagonistic interests compared with the class as a whole; (2) the representative is sufficiently interested in the case outcome to ensure vigorous advocacy; and (3) class counsel is experienced, competent, qualified and able to conduct the litigation vigorously."  *Cavin v. Home Loan Ctr., Inc.*, 236  F.R.D. 387, 392–93 (N.D. Ill. 2006)  (citing *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986)).  The adequacy inquiry involves assessing whether conflicts of interest exist between the named parties and the class they seek to represent.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

E-Conolight does not challenge the adequacy of Doster's counsel.  Notably, Doster is represented by attorneys from Lackey Hershman, L.L.P., which appears to be a capable firm, including attorney Roger Mandel, who indicates he is a prominent Dallas business litigation and class-action lawyer.  (Doc. 32 Ex. Q-1.)

However, concerns about Doster's adequacy as class representative do exist based on Doster's choice of litigation over asking for replacements, labor costs, and refunds.  In *Aqua Dots*, a toy product was recalled after children ingested beads and became sick.  The distributor's recall notice instructed consumers to take the toy kits from children and to return the kits to retailers or contact the distributor for replacement kits or comparably priced toys.  Retailers provided refunds to customers.  The distributor gave customers replacement kits or other toys, although, when asked, it provided refunds.  Consumers returned about 600,000 of the more than 1,000,000 kits that had been sold.  654 F.3d at 750.  At the time of the Seventh Circuit's decision the putative class members could still

12

obtain refunds or replacement. The Seventh Circuit indicated that consideration of this fact was permissible regarding adequacy of the named plaintiffs:

> Plaintiffs want relief that duplicates a remedy that most buyers already have received, and that remains available to all members of the putative class. A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests.

654 F.3d at 752. Like the plaintiffs in *Aqua Dots*, the plaintiffs here could have had refunds or replacement—and may still be able to have them today.[4]

Another concern arises in light of Doster's willingness to drop class members' claims based on the applicable law. It has indicated that "[t]o the extent the Court holds that certain other states' consumer protection statutes must be applied to Class members from those states, rather than Wis. Stat. § 100.18, Doster will not pursue consumer protection statute claims on behalf of those Class members." (Doc. 33 at 2; *see id.* at 23.) However, if Doster drops those class members' consumer protection claims under their own states' statutes, the class members may be barred by res judicata from bringing them. Similarly, Doster indicates a ready willingness to drop the warranty claims of Louisianans if this court holds that multiple states' laws (rather than Wisconsin's law) apply to those claims. (*See id.* at 23.)

That Doster has chosen litigation rather than a remedy already available for replacement or refund and will abandon certain class members' claims such that they may

---

[4] In fact, Doster previously rejected E-Conolight's offer of reimbursement for replacement labor costs at a rate of $40 per LED product, which is what Doster says it seeks as a minimum in this case. Even if Doster recovers something more than $40 per LED product in consequential damages, its decision to incur litigation costs to receive little more than E-Conolight offered previously draws its adequacy into serious question.

13

be barred from bringing them individually persuades the court that conflicts exist between Doster and some class members. While it appears that Doster is sufficiently interested in this case to keep pursuing it vigorously and that class counsel is adequate, the court finds that conflicting and antagonistic interests between Doster and some class members exist such that this Rule 23(a) requirement is *not* met.

B.      Rule 23(b)(3)

Because the adequacy of representation is a close question as discussed above, the court will address Rule 23(b)(3) inasmuch as predominance is an even greater concern. Rule 23(b)(3) specifies two requirements: (1) "that the questions of law or fact in common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Subsection (b)(3) "poses the question whether a single suit would handle the dispute better than multiple suits." *Aqua Dots*, 654 F.3d at 752. The policy at the core of the class action mechanism is to overcome the problem when small recoveries do not provide incentive for any individual to bring a solo action. *Suchanek*, 764 F.3d at 759.

Considerations pertinent to the (b)(3) requirements include the class members' interests in individually controlling separate actions, the extent of any litigation already begun by class members, the desirability of concentrating the litigation in this forum, and likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). No one suggests that any proposed class members have already sued E-Conolight or sought to individually control separate actions. Moreover, concentrating litigation in this forum is

14

desirable, as E-Conolight is located in this district. However, the difficulties of managing this case as a class action are substantial.

      1.     Predominance

The predominance standard is more demanding than the commonality requirement of Rule 23(a). *Comcast*, 133 S. Ct. at 1432. This court must take a "'close look' at whether common questions predominate over individual ones." *Id.* However, although questions common to the class must predominate, Doster does not have to show that those questions will be answered, on the merits, in favor of the class. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. ___, 133 S. Ct. 1184, 1191 (2013). And Rule 23(b)(3) does not require Doster to prove that each element of its claim can be proved class-wide. *Id.* at 1196.

Common issues are those for which the case can be established through common evidence, while individual issues are those for which evidence will vary from class member to class member. *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011). Common issues predominate if they have a direct impact on every class member's effort to establish liability, and if that impact is more substantial than the impact of individualized issues in resolving the claims. *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010). If the defendant has nonfrivolous defenses to liability that are unique to individual class members, common questions may be overwhelmed by individual ones. *Id.* Whether defenses are common or individual requires the court's rigorous inquiry. *Zurn Pex*, 644 F.3d at 619.

  Predominance warrants qualitative and quantitative assessments—it is not simply "bean counting." *Butler II*, 727 F.3d at 801. "The class issues often will be the most

15

complex and costly to prove, while the individual issues and the information needed to prove them will be simpler and more accessible to individual litigants." *Suchanek*, 764 F.3d at 760. For example, proving that products were defective may require technical expertise, expert testimony, and discovery into the defendant's manufacturing processes while individual issues in those cases may be more easily determined. *Id.* Warranty and negligence claims premised on a universal product defect often may provide predominant common issues. *See Zurn Pex*, 644 F.3d at 619 & n.7.

However, when a plaintiff must establish reliance, class certification is "ordinarily preclude[d] . . . because individual reliance issues would overwhelm questions common to the class." *Amgen*, 133 S. Ct. at 1193; *accord Zurn Pex*, 644 F.3d at 619 ("Claims requiring individual proof of reliance are generally not amenable to class certification . . . .").

Individualized monetary claims do not prevent certification of a (b)(3) class. *See Wal-Mart Stores*, 131 S. Ct. at 2558–59; *Suchanek*, 764 F.3d at 756.

> It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.

*Butler II*, 727 F.3d at 801. It is not unusual in class actions to have a final phase in which individualized proof must be submitted. *Suchanek*, 764 F.3d at 756.

But if individual damage calculations would overwhelm the questions common to the class, certification is improper. *Comcast*, 133 S. Ct. at 1432–33. In *Comcast*, the named plaintiffs sought certification of a (b)(3) class of about 2 million Philadelphia-region

16

Comcast subscribers for alleged violations of federal antitrust laws, with four theories of antitrust liability. *Id.* at 1429–30. The district court had certified the class, finding that one theory involved common issues. It believed that the existence of individual injury from that alleged antitrust violation was capable of proof through evidence common to the class rather than individual to its members and that damages were measurable on a class-wide basis through use of a common methodology. *Id.* at 1430. The Supreme Court, however, found that certification was improper because the plaintiffs' damages model did not correspond solely with the theory that had been the basis for class certification; that theory could not be established as the cause of increased cable prices for all class members. *Id.* at 1432–33.[5]

Individualized damages issues are less likely to defeat predominance if damages can be computed according to some formula. *Sacred Heart Health Sys.*, 601 F.3d at 1171. For class actions involving damages, the court should ascertain whether the plaintiffs' damages are susceptible of measurement across the entire class. *Suchanek*, 764 F.3d at 760. The answer may be yes if damages can be computed by taking the difference between the actual value of the product purchased and the inflated price the customer paid. *See id.* For instance, in *In re IKO Roofing Shingle Products Liability Litigation*, 757

---

[5]Said the Court:

> For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (a theory of liability that is not capable of classwide proof); while subscribers in Camden County may have paid elevated prices because of petitioners' increased bargaining power vis-a-vis content providers (another theory that is not capable of classwide proof); while yet other subscribers in Montgomery County may have paid rates produced by the combined effects of multiple forms of alleged antitrust harm; and so on. The permutations involving four theories of liability and 2 million subscribers located in 16 counties are nearly endless.

*Comcast*, 133 S. Ct. at 1434–35.

17

F.3d 599, 603 (7th Cir. 2014), the Seventh Circuit found that damages reflecting the difference in market price between a tile as represented and a tile with the alleged deficiencies would apply to every member of the class.

The existence of some satisfied customers who have not experienced a problem from the alleged defect does not preclude class certification when all class members claim delivery of a good that did not conform to the defendant's warranty and that was worth less than a product without the defect. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 855–57 (6th Cir. 2013) ("*Whirlpool II*"), *cert. denied*, *Whirlpool v. Glazer*, 134 S. Ct. 1277 (2014). "If defective design is ultimately proved, all class members have experienced injury as a result of the decreased value of the product purchased." *Id.* at 856. In *Whirlpool II*, a liability class could be certified regarding whether certain washing machines had a defect that caused mold buildup even though the remedy for class members who had not experienced the alleged mold problem would be resolved through the individual determination of damages. *Id.* at 856.

Whether proof necessary to establish class members' claims is a common or individual matter depends first on what proof is necessary, and that requires determination of what substantive law applies. *Barden*, 249 F.R.D. at 320; *see Powers v. Lycoming Engines*, 272 F.R.D. 414, 419 (E.D. Pa. 2011). "Although there is no categorical bar to class treatment where the law of multiple states will apply, courts have expressed some skepticism of such treatment, particularly in substantive areas where the content of state law tends to differ." *Sacred Heart Health Sys.*, 604 F.3d at 1180. The Seventh Circuit held in *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 288 F.3d 1012 (7th Cir. 2002), that a nationwide consumer class was not manageable, and thus could not be

18

certified, when it depended on the laws of multiple states. The district court had certified two nationwide classes, one of all owners or lessees of a Ford Explorer of model years 1991 through 2001 and one of all owners and lessees of certain tires. *Id.* at 1015. Whether one state's law or the laws of multiple states applied was a key issue on appeal. According to the Seventh Circuit,

> [n]o class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3). Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes. The district judge, well aware of this principle, recognized that uniform law would be essential to class certification.

*Id.* (citations omitted).

    a.  Choice of Law

In the present case, Doster contends that Wisconsin law will apply to all the claims of class members, supporting a finding that common issues predominate, while E-Conolight contends that the laws of all fifty states will apply, supporting a finding that individual issues predominate.

Doster indicates that each state other than Wisconsin has between one and 346 citizens who purchased between two and 2933 of the LED products from E-Conolight. Wisconsin has 344 class members (second to California) who purchased 4235 of the LED products. (Doc. 32 Ex. Q.) During the class period, all of the orders for LED products were received and processed by E-Conolight in Wisconsin, the LED products were stored in and shipped from Wisconsin, and payments for the LED products were received in and

19

deposited in a bank in Wisconsin. In Wisconsin, E-Conolight received and responded to complaints and made its decisions on how to handle such complaints.

Because this court sits in Wisconsin and this case involves state-law claims, the court must apply Wisconsin choice-of-law rules to each claim in the case.[6] *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Ruiz v. Blentech Corp.*, 89 F.3d 320, 324 n.1 (7th Cir. 1996). Under Wisconsin choice-of-law rules, the law of the forum presumptively applies unless there are non-forum contacts that are of greater significance. *Wilcox v. Wilcox*, 26 Wis.2d 617, 634, 133 N.W.2d 408 (1965). And "[b]efore a conflict-of-law problem is presented, it must appear that the ultimate selection of law will affect the outcome." *Henderson v. State Farm Mut. Auto. Ins. Co.*, 59 Wis. 2d 451, 454, 208 423 (1973). However, because the laws of fifty states and the District of Columbia are at issue, this court will first determine whether applying the law of any other state is justified before analyzing the differences nationwide.

The claims of a MMWA violation, breach of the implied warranty of merchantability, and declaratory judgment regarding the written warranty all involve Wisconsin's choice-of-law rules for contracts. The deceptive trade practices claim under Wis. Stat. § 100.18 involves Wisconsin's choice-of-law rules for torts. *MBI Acquisition Partners, L.P. v. Chronicle Publ'g Co.*, No. 01-C-177-C, 2001 WL 1478812, *5 (W.D. Wis. Sept. 6, 2001).

---

[6]Under the MMWA, the court is to apply state warranty law. The MMWA does not create any federal law of warranty but instead requires district courts to apply the underlying state's warranty law. *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1012 (7th Cir. 1986) ("We hold . . . that, except in the specific instances in which Magnuson-Moss expressly prescribes a regulating rule, the Act calls for the application of state written and implied warranty law, not the creation of additional federal law.") Implied warranty claims asserted under the Act are interpreted solely under state law and thus, if state law requires privity of contract to establish a breach of an implied warranty, privity is also required under the Act. *See Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 525 (7th Cir.2003); *Sheehan v. Monaco Coach Corp.*, No. 04-C-717, 2006 WL 208689, *6 (E.D. Wis. Jan. 25, 2006) (Callahan, M.J.).

20

"In contractual disputes, Wisconsin courts apply the 'grouping of contacts' rule, that is, that contract rights must be 'determined by the law of the [jurisdiction] with which the contract has its most significant relationship.'" *State Farm Mut. Auto Ins. Co. v. Gillette*, 2002 WI 31, ¶ 26, 251 Wis. 2d 561, ¶ 26, 641 N.W.2d 662, ¶ 26 (footnotes omitted) (alteration in original). The court evaluates five factors to determine which state has the most significant contacts with the case: (1) the place of contracting; (2) the place of negotiating of the contract; (3) the place of performance; (4) the place the contract subject matter is situated: and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Haines v. Mid-Century Ins. Co.*, 47 Wis. 2d 442, 446, 177 N.W.2d 328 (1970); *NCR Corp. v. Transp. Ins. Co.*, 2012 WI App 108, ¶ 13, 344 Wis. 2d 494, ¶ 13, 823 N.W.2d 532, ¶ 13. The contacts are not simply counted; they are assessed qualitatively and by determining which are most significant. *Haines*, 47 Wis. 2d at 447. The choice-of-law rules for tort claims that are tied to contract claims require consideration of the same factors that apply to contracts, with the additional consideration of where the injurious conduct and injury occurred. *NCR Corp.*, 2012 WI App 108, ¶ 13.[7]

If one state's contacts are clearly more significant, the court can terminate analysis after consideration of the above factors. *Id.* However, if consideration of the above factors does not identify which state's law should apply, the court also considers, regardless of the area of law involved, the "choice-influencing factors" of (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task;

---

[7]However, where no contract is involved, a court focuses on the relationship to the occurrence to the parties rather than the relationship to the transaction of the parties, looking at (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship between the parties is centered. *NCR Transport Corp.*, 2012 WI App 108, ¶ 13 n.2.

(4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *Id.* ¶ 14; *see Drinkwater v. Am. Family Mut. Ins. Co.*, 2006 WI 56, ¶ 40, 290 Wis. 2d ¶ 40, 714 N.W.2d 568, ¶ 40.

## I. Warranty Claims

In this case, except as to proposed class members in Wisconsin, the home state of each has more significant contacts with that member's case than Wisconsin. Doster does not suggest that purchasers of E-Conolight's light fixtures came to Wisconsin to negotiate and sign their purchase contracts and take delivery of the LED products here. Instead, it acknowledges that orders were placed by phone, email, fax, or internet, and that LED products were shipped from Wisconsin and delivered in the states of the purchasers. (Doc. 32 Ex. D at 48–50.) However, though E-Conolight is in Wisconsin, its servers and website host are in Illinois and its credit card payments were processed in Virginia. (Doc. 44 Ex. 42 at 2.)

Doster contends that because class members communicated *to* and placed their orders to E-Conolight *in* Wisconsin, made payments to E-Conolight in Wisconsin, and the LED products were shipped from Wisconsin, the first four categories of contacts favor Wisconsin. But Doster ignores that the proposed class members were communicating *from*, placing their orders *from*, sending payments *from*, and receiving the LED products *in* other states, and the other states are where some of the allegedly defective products still are situated.

Regarding place of contracting, Doster has not provided sufficient discussion, evidence or detail for the court to conclude where the last act occurred for the transactions at issue. Thus, the court finds that factor for consideration is evenly divided. Regarding

22

contract negotiation, it is unclear whether there was any negotiation about purchases, but even if there was the state contacts are divided evenly—customers negotiated in their home states while E-Conolight negotiated in Wisconsin.

Similarly, customers performed their contract obligations in their home states while E-Conolight performed many of its contract obligations in Wisconsin.  At least one court has found that the place of performance for claims similar to those in this case is the state where the customer took delivery of the LED products.  *Powers*, 272 F.R.D. at 422 ("[P]erformance occurred in the state where each buyer took delivery.").

Doster contends that the LED products were defective at the time of delivery. Customers had no claims against E-Conolight for breach of the implied warranty of merchantability until they received the allegedly defective merchandise.  Moreover, the final significant event for performance occurred when the goods were delivered to the customers.  Hence, this fact tilts consideration of contract performance toward the states of the customers.

The fourth factor is the location of the subject matter of the contract, i.e., the LED products.  Those states are where the LED products were received and intended for use and, very importantly, where the LED products did or potentially could have failed.  The court believes that this is the most important of the five contacts to consider.  This factor weighs heavily in favor of the applying laws of other states in deciding this case.

The fifth factor under the grouping of contacts rule that accounts for the parties' place of business and the place of incorporation is balanced, except as to those customers located or incorporated in Wisconsin.  Doster contends that this factor favors Wisconsin, too, because Wisconsin has a connection with E-Conolight and every class member,

whereas the connection of other states is with particular class members. However, the court looks at each transaction individually, thereby making the fifth factor a draw for class members who reside outside of Wisconsin.

Although Doster cites a few cases supporting its view that when a good is purchased from a dealer in one state by a customer in another, the transaction occurs where the dealer and good are located, *see Lamont v. Winnebago Indus., Inc.*, 569 F. Supp. 2d 806, 810 (E.D. Wis. 2008); *Dresser Indus., Inc. Waukesha Engine Div. v. Gradall Co.*, 702 F. Supp. 726, 731 (E.D. Wis. 1988); *Int'l Prod. Specialists v. Schwing Am.*, No. 05-C-621, 2007 WL 2903239 (E.D. Wis. Sept. 28, 2007), *rev'd on other grounds,* 580 F.3d 587 (7th Cir. 2009), those cases are inapposite or distinguishable.[8] However, cases that are more on-point undercut Doster's view. *Barden*, discussed briefly above regarding commonality, dealt with a putative class action by plaintiffs residing in thirty-eight states

---

[8]In *Lamont*, District Judge William Griesbach found that the Wisconsin lemon law did not apply to an RV purchased by Wisconsinites not under the grouping-of-contacts test but instead under specific language of the lemon law that says it applies when a consumer purchases or accepts transfer of the vehicle in Wisconsin but the consumers drove to the Illinois dealership to sign the purchase contract, pay the majority of the purchase price, and take possession of the RV. 569 F. Supp. 2d at 809–12. Judge Griesbach applied Wisconsin law to the implied warranty claim not because the purchasers were located in Wisconsin but because both parties relied on Wisconsin law in their arguments and did not raise a conflicts issue. *Id.* at 814 & n.3.

In *International Production Specialists*, District Judge Rudolph Randa applied Wisconsin law under the grouping-of-contacts test when the contracts were made in Connecticut and Wisconsin, the contracts were negotiated in those two states plus Illinois, performance took place in Wisconsin and Illinois, all of the work to obtain a 60% payment was done in Wisconsin though work on a change order occurred in Illinois, the location of the subject matter was in Illinois, and the locations of the parties were Wisconsin and Minnesota. 2007 WL 2903239, at *10. The facts involved the manufacture and installation of silos, and Judge Randa expressly noted that most of the contract work (the manufacturing, as installation was on a site in Illinois) was to be performed in Wisconsin by a Wisconsin corporation. *Id.* Moreover, he called his decision to apply Wisconsin law a "close question." *Id.* Unlike the situation here (when each purchase is analyzed separately), contacts were split among four states, and most in number and significance pointed to Wisconsin.

*Dresser* is the closest factually—an Ohio corporation located in Ohio purchased engines from the Wisconsin-located division of a Delaware corporation. However, the parties had failed to address the choice of law factors in their briefs and the court's analysis was thin. The few contacts the court referenced included the fact that the Ohio corporation had initially reached out to the Wisconsin division for the purchase and that the manufacture of the engines occurred in Wisconsin. Here, it appears that E-Conolight reached out to customers through its catalogs and online advertising and there is no suggestion that the LED products were manufactured in Wisconsin.

24

alleging breach of express warranty for failure of gas-filled windows to retain the gas. Judge Adelman recognized that the laws of the class members' home states applied: "Each class member more than likely purchased the Hurd product in his or her home state, thus, virtually everything of significance relating to the transaction likely happened there." 249 F.R.D. at 320. Doster insufficiently distinguishes the present case from *Barden*.

In *Powers*, the plaintiffs sought certification of a nationwide class of owners or previous owners of aircraft equipped with the defendant's engines, asserting that the engines were manufactured with defective crankshafts and that Lycoming knew of and concealed the defect. Claims included breach of the implied warranty of merchantability. 272 F.R.D. at 419. The plaintiffs argued that the law of Pennsylvania, where Lycoming was located, should apply to all claims. *Id.* at 417.

The district judge applied the law of the state of purchase because that state had the most significant contacts with the contract issue and had a greater interest in having its law enforced. *Id.* Pennsylvania's choice-of-law principles, similar to Wisconsin's principles, involved the most significant relationship with the transaction including the factors of where the contract was made, negotiated, and performed; the location of the subject matter of the contract; and the domicile, residence, place of incorporation, and place of business of the parties. *Id.* at 421–22. The court found that each putative class member's state of purchase had the most significant relationship with each contract.

Doster contends that Wisconsin has a strong policy interest in regulating the liability of manufacturers located in Wisconsin. This court, like Judge Adelman in *Barden*, rejects that argument. Other states have similar policy interests in protecting their citizens as consumers. Plaintiffs do not claim that E-Conolight violated some Wisconsin state statute

25

regulating manufacturing or product standards but that E-Conolight breached its implied warranty, and such an issue is more one of consumer protection than regulating manufacturing. *See Barden*, 249 F.R.D. at 320. Doster recognizes that the choices made by various states in adopting causes of action for implied warranty of merchantability involved balancing protections of buyers in their states (from receiving inadequate and defective goods) with protecting sellers in their states (from liability). (Doc. 33 at 16–17.) But it argues that Wisconsin law generally protects consumers and places higher standards of conduct on businesses, so applying Wisconsin law furthers Wisconsin's policy. However, the court is not persuaded that other states' interests in protecting their consumers to be less than Wisconsin's interest.

In *Bridgestone/Firestone*, the Seventh Circuit analyzed a choice of law question for a proposed class action that was brought in Indiana, which applies the law of the place where harm occurred. The court noted that the proposed class was effectively made of those consumers whose loss was financial rather than physical—the persons whose tires had not failed and whose Explorers had not rolled over—and many faced no future threat of failure, because various tires had been recalled or replaced. 288 F.3d at 1016. The court found that the financial loss was suffered in the states where the vehicles and tires were purchased or resold, not where the tire and car manufacturers had their headquarters. *Id.* In response to the named plaintiffs' arguments that their claims were for breach of warranty and consumer fraud rather than tort, the Seventh Circuit indicated that nevertheless "the injury is decidedly where the *consumer* is located, rather than where the seller maintains its headquarters." *Id.* at 1017.

26

Thus, because the place of performance and location of the subject matter indicate that contacts with other states outweigh the weak presumption of forum law, the most significant contacts lie outside of Wisconsin. The tie-breaker considerations need not be addressed. But this court next must determine whether the application of other states' laws to the claims is a non-issue because all of the laws are similar. On this point, the parties disagree as to who bears the burden. E-Conolight contends that Doster, as the party seeking class certification, bears the burden of establishing that the laws of all fifty states are sufficiently uniform such that common issues predominate. Doster, on the other hand, contends that E-Conolight, as the party seeking application of the laws of a state other than the forum, bears the burden of establishing that the laws of the other states differ in an outcome-determinative way. (Doc. 33 at 13 (citing *Triple Interest, Inc. v. Motel 6, Inc.*, 414 F. Supp. 589, 593 (W.D. Wis. 1976); Doc. 48 at 2.)

The court places the burden of showing similarity on Doster. Ultimately, the present matter is one of class certification rather than the merits, and Doster bears the burden of showing that certification is proper. "Undeniably, it falls to the plaintiff to demonstrate the homogeneity of different states' laws, or at least to show that any variation they contain is manageable." *Sacred Heart Health Sys.*, 601 F.3d at 1180. In cases potentially involving the law of all fifty states, the party seeking certification must provide an extensive analysis of state law variations to address whether the differences in law pose insuperable obstacles. *Id.*

27

Doster contends that the warranty laws of forty-nine states (excluding Louisiana) and the District of Columbia are based on the Uniform Commercial Code[9] and thus are sufficiently similar for certification purposes. It maintains that although some differences exist, thirteen jury questions will determine the necessary elements for all forty-nine states' laws. However, the court is not persuaded that the various states' laws are the same, and thirteen questions suggest that subclasses would be necessary in any event.

Some states require proof of a plaintiff's reliance in implied-warranty claims. In *Barden*, Judge Adelman analyzed this reliance requirement in addition to the notice requirement of some states and found that among thirty-eight states' breach-of-warranty laws, there were four subclasses: "(1) reliance necessary, pre-litigation notice necessary; (2) reliance necessary, pre-litigation notice not necessary; (3) reliance not necessary, pre-litigation notice necessary; and (4) reliance not necessary, pre-litigation notice not necessary." 249 F.R.D. at 321. Judge Adelman found that only the fourth subclass could be certified, as the principal issues related to the warranty and the alleged defect could be determined on a class-wide basis. *Id.* However, "[t]he laws in the first three of plaintiff's proposed sub-classes require a determination of whether each individual class member relied on the warranty and/or provided pre-litigation notice to the defendant. To make these determinations would appear to require a realtively intensive factual inquiry into each individual case. . . . Thus, as to the first three proposed sub-classes, it seems likely that a significant part of each member's claim would have to be resolved on an individual basis, thus defeating the purpose of a class action." *Id.* Judge Adelman proactively redefined

---

[9]UCC § 2-314(2)(a) and (c) and § 2-104(1) for the implied warranty of merchantability. (*See* Doc. 33 at 41–42.)

the class to reflect only purchasers of Hurd inert gas-filled insulated glass products located in the states of the fourth category.[10]  *Id.* at 322.

The *Powers* court noted that all states except Louisiana adopted § 2–314 of the Uniform Commercial Code, which provides that unless excluded or modified, a warranty that the goods are merchantable is implied in a contract for sale.  *Id.* at 420.  However, the court found, there are significant differences among the states regarding application of the law because eighteen states required privity of contract for recovery.  *Id.* at 420–21. Further, said the court, irreconcilable differences among the states existed regarding notice.  *See id.* at 421 n.20, 425.  Material differences exist among the states as to the defense of disclaimer, as well.  *Id.*[11]

In *Bridgestone/Firestone*, the Seventh Circuit noted that consumer protection laws varied considerably between the states and found that because the plaintiffs' claims had to be adjudicated under the laws of so many jurisdictions, a single, nationwide class was not manageable.  *Id.* at 1018.

---

[10]Connecticut, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Vermont, Virginia, West Virginia, Wisconsin, and District of Columbia.

[11]In analyzing the different state laws regarding disclaimers of the implied warranty of merchantability, the *Powers* court noted that Mississippi does not allow any disclaimer, Vermont does not allow disclaimers for new or unused consumer goods, several states require that the disclaimer use the word "merchantability" and be conspicuous, others require only that the disclaimer be conspicuous, three states disfavor disclaimers unless they are set forth with particularity, some states allow a disclaimer unless it is unconscionable, one state requires a disclaimer to appear in clear terms and be brought to the attention of the buyer, and West Virginia allows implied warranties to be limited but not in consumer transactions.  *Id.* at 428.  The court similarly analyzed notice requirements and limitations on remedies.  The court found that such differences permitted Lycoming to raise defenses in some states and because the court could not group the differing laws of the states, "a single nationwide class action would be unmanageable."  *Id.* at 430.

29

As discussed in *Barden* and *Powers*, material differences exist between the various states. Thus, the laws of fifty jurisdictions (all states except Louisiana, plus the District of Columbia) apply to the warranty claims.

        ii.     Tort Claim

In addition to the first five factors that point to the application of the laws of other states, the court must weigh the factors concerning tort claims. The tortious conduct may have occurred in Wisconsin, where E-Conolight made its representations, in Illinois where its servers and website are hosted, or in the jurisdictions where customers received their catalogs or saw the misrepresentations on E-Conolight's website that led to their purchases. But the injuries were sustained where the customers took delivery of a defective item based on the misrepresentation. In most instances this would have been outside Wisconsin. Thus, the conflicts factors weigh in favor of applying the laws of states other than Wisconsin.

As for outcome-determinative differences, Doster acknowledges that the consumer protection statutes of the states and the District of Columbia "vary enough to make application of 50 of them in one lawsuit impracticable." (Doc. 48 at 3.) It has said that if the court determines that the laws of other states apply, it wishes to drop any claims similar to those under Wis. Stat. § 100.18 as to class members outside of Wisconsin. Thus, the court need not analyze the laws of fifty jurisdictions to determine if the differences are outcome determinative.

        b.     Assessing Predominance Factors

Doster fails to persuade this court that common issues predominate. Although several common issues exist, individual issues outweigh them. The common issues are

30

not as substantial as Doster suggests, and the application of multiple states' laws and matters of individual reliance and damages outweigh the common issues.

Doster contends that the MMWA claim involves common issues of whether E-Conolight constitutes a supplier and whether the LED products constitute consumer products, both of which are determined by uniform federal law. Also, it submits that common issues include whether the implied warranty of merchantability arose and was breached, whether E-Conolight constitutes a warrantor and whether class members are consumers, questions of state law. (Doc. 33 at 27–28.) The court notes these basic central common questions: whether the LED products contained a defect and whether that defect made the product unmerchantable.

As to the implied warranty claim under state law, common questions include those related to defects and whether E-Conolight was a merchant regarding the LED products. Moreover, a common question exists as to whether the written limitation on warranties covers LED products. As to the claim that E-Conolight violated Wis. Stat. § 100.18,[12] a common question exists as to whether Doster's uniform conduct towards class members violated the statute.

However, the common issues are not as prominent as Doster suggests. E-Conolight admits that the gaskets in its LED arrays caused sulphur gas, which led to product failure. "E-Conolight is not contesting that it is responsible for *any* fixture that did not operate as anticipated, nor is it contesting that it is obligated pursuant to the terms of its warranty to repair or replace that product." (Doc. 41 at 38.) Thus, the most prominent

---

[12] The court assumes for present purposes that Doster would dismiss, as it has represented, all claims under similar statutes in other states. As admitted by Doster, application of multiple states' laws alone would make a class action unmanageable.

31

common issue—whether there was a problem with the LED products that led to product failure—will not require as much attention and proof as other issues. Further, Doster admits that it expects that E-Conolight will not contest whether it is a supplier under the MMWA or a merchant under state warranty law and that those issues will be decided by this court as a matter of law. (Doc. 33 at 28, 30.) Thus, the battle between the parties will focus far less on these common issues than on other issues, such as the individual liability and damages issues.

The application of the laws of fifty jurisdictions to the warranty-based claims creates insurmountable individual issues. Even though those various laws could be the basis for subclasses, multiple distinct liability issues would exist. Doster contends that even if the laws of all fifty jurisdictions apply, this case can be resolved by using thirteen questions at trial. But those thirteen questions highlight the various differences in the case, especially when compared to the seven questions Doster would use if only Wisconsin law applied to the warranty claims. (*Compare* Doc. 33 at 29–30 *with id.* at 44–45.)

To address the different states' laws, Doster proposes one merchantability question that applies to all jurisdictions except California, Louisiana, and Maine ("Did the LED Products pass without objection in the trade under the contract description?"), one question that applies only to California ("Were the LED Products not of the same quality as those generally acceptable in the trade?"), and one question that applies only to Maine ("Did the LED Products conform to their contract description?"). (Doc. 33 at 44.) Similarly, Doster proposes one proximate-cause question for all jurisdictions except California, Louisiana, and Maine, and one separate question each for California and Maine. (*Id.* at 44–45.) Then Doster adds a question (regarding use for ordinary purpose) for class members in Alabama

32

and Missouri, and another question (regarding whether the LED products were defective) for class members in Maine, South Carolina, Texas and Utah only. (*Id.* at 45.) The jury instructions explaining these variances in language would likely be confusing for a jury.

Similarly, questions about whether the written product warranty disclaims the implied warranty or excludes labor damages likely will vary, as indicated in *Powers*. Doster contends that all jurisdictions except Louisiana have adopted UCC § 2-316, allowing disclaimer of the implied warranty of merchantability only if the disclaimer mentions the word "merchantability" and, if in writing, is "conspicuous." (Doc. 33 at 46.) According to Doster, forty-two jurisdictions have adopted the same definition of "conspicuous," and the remaining eight have adopted slightly different language, though it should not lead to a different common result (*Id.* at 46–47.) But for the reasons set forth in *Powers,* this court believes that the various differences in disclaimer law will create individual issues that will be unmanageable.

The *Powers* court found that individual issues predominated: "Given the multitude of differences in the legal standards applicable to each class member's claim, determining liability at trial would require an individualized factual inquiry. The fact finder would have to determine where each class member purchased the aircraft or engine and then apply that state's law, which in turn requires sifting through differing definitions of merchantability, limitations of liability, and various defenses." 272 F.R.D. at 426. These individual matters overwhelmed the common legal issues regarding the crankshaft defect. *See id.* The court concluded in light of the multiple differences regarding the implied warranty of merchantability and the defense of valid disclaimer, and its inability to "group the differing

33

laws to apply them as a unit, a single nationwide class action would be unmanageable." *Id.* at 430.

As for the Wis. Stat. § 100.18 claim, the elements are that the defendant made a representation to the public with intent to induce an obligation; the representation was untrue, deceptive, or misleading; and the representation caused a pecuniary loss to the plaintiff. *Novell v. Migliaccio*, 2008 WI 44, ¶ 49, 309 Wis. 2d 132, ¶ 49, 749 N.W.2d 544, ¶ 49. Reasonable reliance is not an element of the claim. *See id.* ¶¶ 45–49. However, the reasonableness of a plaintiff's actions in relying on the representation is a defense to the claim. *Id.* Whether a plaintiff's loss was caused by the misrepresentation depends on whether the plaintiff would have acted in its absence, and the misrepresentation had to have been a significant factor contributing to the plaintiff's decision.

Here, whether E-Conolight made a representation with the required intent and whether the representation was untrue, deceptive, or misleading may be common questions. On the other hand, questions of reasonable reliance by purchasers will vary. Doster argues that

> no Class member possibly could have had individualized knowledge that made reliance on the representations unreasonable. . . . LED lighting was new in general at the time, and the LED Products themselves had just been designed and begun to be manufactured and sold by E-Conolight. Because they were new products, the only information available on them were the representations contained in E-Conolight's catalogs and on its website.

(Doc. 33 at 48.) However, that LED technology and products were new to the market also suggests that purchasers maybe should have been more wary than purchasers of technology and products in a well established market. And each purchaser may have had different information or experience with LED technology or the products in dispute.

34

As for damages, Doster contends that they can be calculated by a common methodology—subtracting the value of the defective LED products (which Doster claims to be zero) from the value of the LED products as warranted, i.e., the sale price. Doster contends that determining the value of the defective LED products is a common issue that will not vary with the individual circumstances of class members.

But Doster's suggested calculation does not account for the calculations of consequential damages, an individual matter. Doster says it does not intend to offer individualized evidence of consequential damages but will present common evidence showing a minimum per fixture charge that could apply to every LED product, such as $40 per fixture. It submits that any problem respecting individual labor expenses may be resolved by surveying various class members to determine those costs. But use of any such survey highlights the individual nature of the inquiry.

The consequential damages are not subject to class-wide proof; Doster seeks to establish an average damage amount with a calculation using individual information. These damages are not like statutory damages or other damages that could be considered uniform across the class or subject to a simple calculation. Labor costs for each class member could differ based on labor rates in the particular geographic area and where the light fixtures are located (indoors or outdoors, on a garage or in a tree, etc.). And Doster has not persuaded the court that the amount charged for replacement is the same for each type of fixture at issue.[13] Individual inquiries will be required to determine whether the labor costs are reasonable for each plaintiff.

_____

[13]Some individual class members' consequential damages may vastly exceed the $40 standard amount, and Doster's concession in this regard again draws into question its adequacy as a class representative.

35

Doster's description of the remedies sought highlights the need to separate plaintiffs into at least two groups for damages:

> [T]hose members of the Class who did not receive re-worked replacements from E-Conolight seek to recover the full purchase price of the products, plus the labor costs involved in removing and replacing them. Those Class members who did received [sic] re-worked replacement products from E-Conolight, which themselves have not failed, seek to recover the labor costs involved in removing and replacing the defective LED Products.

(Doc. 33 at 1.) But determining consequential damages will need to be more individual than that. The evidence indicates that some, but not all, class members have already received reimbursement for labor costs. Under E-Conolight's policy, those customers who asked for reimbursement were given it. Hence, some class members may have received full reimbursement of labor costs while others received partial or no reimbursement. For instance, Sechler Electric has received reimbursement of replacement costs at a rate of $56 per fixture, but only for about half of the labor hours requested. (*See* Doc. 32 Ex. L, ¶ 14.) Individual inquiries will be necessary to determine whether class members are owed more than they have received to date.

Doster points to *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010), as the most significant case to support its statement that courts across the country have held that the existence of a common defect constitutes a predominating common issue in suits asserting breach of warranty and consumer protection violations. (Doc. 33 at 32–33.) In *Pella*, the Seventh Circuit affirmed certification of seven classes. One nationwide class of members whose casement windows were alleged to have a defect that did not yet manifest itself was certified under Rule 23(b)(2); that class sought declarations about the windows and the manufacturer's conduct. *Id*. at 392. The other classes consisted of those whose windows

36

had already manifested a defect and whose windows had been replaced; the district court certified six statewide liability classes under Rule 23(b)(3). The Rule 23(b)(3) class plaintiffs contended that Pella violated state consumer fraud laws by failing to disclose the defect. The district court declined to certify issues relating to causation, damages, and statute of limitations; instead, the classes were certified for liability purposes only. *Id.* at 392–93. The Seventh Circuit held that the district court properly concluded "that the common predominant issue of whether the windows suffer from a single, inherent design defect leading to wood rot is the essence of the dispute and is better resolved by class treatment" and that the district court "reasonably determined that the individual issues that necessarily arise in a consumer fraud action would not prevent class treatment of the narrow liability issues." *Id.* at 393. The predominance requirement was satisfied because the central questions in the litigation were the same for all class members: whether the windows suffered from an inherent defect when they left the factory, whether and when Pella knew of the defect, the scope of Pella's warranty, and the nature of a particular customer program and whether it amended the warranty. *Id.* at 394. Importantly, the district court found that the consumer protection acts of the six states (California, Florida, Illinois, Michigan, New Jersey, and New York) had nearly identical elements. *Id.* at 392, 396. However, the court declined to certify a seventh state class that would have required a different analysis. *Id.* at 396.

This case differs from *Pella* in several ways. First, as discussed above, the class is not limited solely to those in states whose laws have nearly identical elements—the *Pella* district court *declined* to certify an additional class with different legal elements—and even in *Pella* each state's residents were separated into a subclass. Second, Doster seeks

37

certification of a class for damages purposes as well as liability, extending beyond what was permitted in *Pella*. Doster points to "black letter law that the need to calculate damages individually does not prevent class certification." (Doc. 33 at 34.) But Doster overlooks that several of the cases on which it relies were certified for liability only, yet Doster seeks certification for liability *and* damages purposes. As *Comcast* indicates, for class certification on damages, common questions must exist as to damages issues as well as liability issues. And third, the heart of the common dispute in *Pella* was still to be determined: whether the windows suffered from a single, inherent design defect leading to wood rot. Here, E-Conolight has admitted many of the facts regarding the cause of the LED products' failure—what is left are predominantly individual issues, not common ones.

Doster cites to *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010), as well, to support its statement that a common defect constitutes a predominating common issue in suits asserting breach of consumer protection statutes and breach of warranty. But the *Wolin* court did not go so far as Doster suggests. As to the tire warranty claims in *Wolin*, several individual evidence issues existed, such as whether the Land Rovers' defective alignment (rather than where and how the tires were driven) caused a given class member's tires to wear prematurely. The court noted that those individual issues could make class-wide adjudication inappropriate. *Id.* at 1174. The case was remanded for the district court to reassess certification with the correct legal principles in mind; the appellate court did not hold that class certification was required. *Id.*

In briefing and at oral argument, the parties discussed the Seventh Circuit opinion in "*Butler I*", and the Sixth Circuit's decision in *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, 678 F.3d 409 (6th Cir. 2012) (*"Whirlpool I"*), *cert. granted and*

38

*judgment vacated, Whirlpool Corp. v. Glazer,* 133 S. Ct. 1722 (2013). Both cases concerned alleged product defects in Whirlpool-manufactured washing machines, which defects resulted in mold growth and odor. Both *Butler I* and *Whirlpool I* were vacated and remanded for reconsideration in light of *Comcast.* On remand, after oral argument in this case, both circuit courts came to the same result as before. Pointing to *Butler I*, *Whirlpool I*, and *Pella*, Doster contends that the "recent trend, in both multi-state and single-state cases, is to certify classes seeking recovery for breach of implied warranties based on product defects, *at least as to liability.*" (Doc. 48 at 2.)

In *Butler I*, the class brought breach-of-warranty claims under the laws of six states. The district court had denied certification of a six-state class regarding the mold issue, but the Seventh Circuit reversed and indicated that certification of the class was proper. The Seventh Circuit indicated that on remand the district judge might decide to create subclasses, in part because Sears's liability might vary due to differences among the various states' laws, but that possibility was not an obstacle to certification of a single class at the outset.

Certiorari was granted and the decision was vacated and remanded for reconsideration in light of *Comcast.* Upon reconsideration, the Seventh Circuit reinstated its initial opinion, finding that unlike the situation in *Comcast*, there was no possibility that damages could be attributed to the conduct of Sears that was not challenged on a class-wide basis; all members of the class attributed their damages to mold. Any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty as alleged in the complaint. 727 F.3d at 800. "Furthermore and fundamentally, the district court in [*Butler I*], unlike *Comcast*, neither was asked to decide nor did decide

39

whether to determine damages on a class-wide basis." *Id.* The Seventh Circuit reiterated that a class action limited to determining liability on a class-wide basis, with separate hearings to determine damages, "will often be the sensible way to proceed." *Id.* The appellate panel read *Comcast* as addressing the situation where, because the plaintiffs sought damages beyond those flowing from the common theory of antitrust injury, the possibility loomed that individual questions would predominate over common questions. *Id.* The *Butler II* court reiterated that there was a single, central issue of liability: whether the Sears washing machine models were defective. *Id.* at 801. "Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses." *Id.* at 802.

The *Whirlpool I* and *Whirlpool II* case involved a single-state (Ohio) plaintiff class alleging, similar to *Butler I*, that design defects allowed mold and mildew to grow in certain washing machines. *Whirlpool II*, 722 F.3d at 844. The district court certified a liability class under Fed. R. Civ. P. 23(b)(3) on plaintiffs' claims of tortious breach of warranty, negligent design, and negligent failure to warn. Damages were left for individual determination. *Id.* at 844, 849. The Sixth Circuit affirmed, but the Supreme Court granted a petition for certiorari and vacated and remanded the case for further consideration in light of *Comcast*. Following remand, the Sixth Circuit affirmed again. *Id.* at 845. Two primary questions were common for the class: (1) whether the alleged design defects in the machines proximately caused mold or mildew to develop and (2) whether Whirlpool adequately warned the consumer who purchased the machines about the propensity for mold growth. *Id.* at 853. The first question would resolve in one stroke the tortious breach of warranty and negligent design claims, and decision on the second question was required for the failure-to-warn

40

claim. *Id.* at 853–54. Common proof would produce a common answer. *Id.* at 855. Moreover, these two common questions predominated over any individual questions. *Id.* at 859. The court indicated that no matter how individualized the issue of damages could be, the question of liability could be tried as a class action. *Id.* at 854.

*Whirlpool II* contained none of the major problems of the present case—it concerned liability only and the law of just one state. Thus, the individual issues did not predominate. Here, plaintiffs seek certification of a nationwide class concerning liability and damages. In contrast to *Whirlpool II*, *Comcast* involved class certification for liability *and* damages, and there the Supreme Court found that the plaintiffs had to establish the existence of a common theory or proof regarding damages, too. The *Comcast* Court found that the model purporting to serve as evidence of damages could not possibly establish that damages were susceptible of measurement across the entire class; thus questions of individual damage calculations would overwhelm questions common to the class. *Comcast*, 133 S. Ct. at 1433. The *Whirlpool II* court pointed to this distinction:

> This case is different from *Comcast Corp.* Here the district court certified only a liability class and reserved all issues concerning damages for individual determination; in *Comcast Corp.* the court certified a class to determine both liability and damages. Where determinations on liability and damages have been bifurcated, *see* Fed. R. Civ. P. 23(c)(4), the decision in *Comcast*—to reject certification of a liability and damages class because plaintiffs failed to establish that damages could be measured on a classwide basis—has limited application. To the extent that *Comcast Corp.* reaffirms the settled rule that liability issues relating to injury must be susceptible of proof on a classwide basis to meet the predominance standard, our opinion thoroughly demonstrates why that requirement is met in this case.

722 F.3d at 860.

Further, in many cases in which an appellate court has noted that class certification could be appropriate, that court did not hold that class certification was required. For

41

instance, in *Suchanek*, the Seventh Circuit did not hold that the district court had to certify the class on remand. Instead, it remanded for the district court to apply the correct legal standards and principles. 764 F.3d at 761.[14]

Under Rule 23, district courts are permitted to "devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues." *Pella*, 606 F.3d at 396. "A district court has the discretion to split a case by certifying a class for some issues, but not others, or by certifying a class for liability alone where damages or causation may require individualized assessments." *Pella*, 606 F.3d at 394. As discussed above, Judge Adelman redefined a class when only one subset of class members had a common liability case.

Here, Doster initially asked the court to certify a liability-only class or any combination of subclasses. Instead, it sought essentially all or nothing—a nationwide class for liability and damages, with alterations only for Louisiana residents. The court believes such a class to have too many individual issues, which overwhelm the common ones. In Doster's motion for reconsideration, long after original briefing and oral argument was completed, it contends that the court should at a minimum certify the case as to liability, causation and direct damages, or at least liability. The request for limited certification comes very late, was not fully discussed, and is rejected for that reason. Moreover, the individual issues from application of multiple states' laws remain, preventing such a limited certification.[15]

---

[14] The district court had failed to recognize the common question of whether the coffee-pod packaging at issue was likely to mislead a reasonable consumer. *Id.* at 755.)

[15] Doster has not suggested any grouping of states into manageable subclasses.

2.      Superiority

The court will address superiority to complete the Rule 23(b)(3) requirements fully. "The smaller the stakes to each victim of unlawful conduct, the greater the economies of class action treatment and the likelier that the class members will receive some money rather than (without a class action) probably nothing . . . ." *Hughes v. Kore of Ind. Enters.*, 731 F.3d 672, 675 (7th Cir. 2013).

Doster uses an average number to argue that this case is economically not feasible for class members to pursue on their own:  each class member purchased about eight of the LED products at an average price of $120 each with a minimum estimated cost of replacement of $40 each, meaning $960 in direct damages and $320 in consequential damages.  Though that total of $1280 would be considered an amount not feasible to justify suit of this sort, Doster does not acknowledge that it (and perhaps a few other class members) may be willing to pursue the case because of their actual purchase amounts. Apparently, Doster has asserted individual damages of $117,285.  (*See* Doc. 41 at 36; Doc. 44 Ex. 1 at 30, Ex. 43.)  Nevertheless, the court recognizes that for any purchasers of a handful of LED products from E-Conolight, the cost of individual suits would be substantial.  And for some class members, a lawsuit is just not an option.  Sechler Electric, for instance, has indicated that it has neither the time nor the resources to bring its own lawsuit against E-Conolight.  (Doc. 32 Ex. L, ¶ 16.)

However, the difficulty of applying the law of fifty jurisdictions greatly reduces the likelihood that a class action would be superior.  The *Powers* court found that "[g]iven the difficult, if not, impossible burden of instructing the jury on the different laws of several states, a nationwide class action can not pass the superiority test."  292 F.R.D. at 427.

43

Though a class can be certified when differences between state laws are relatively minor, that was not the case in *Powers* or here. In this instance the court is persuaded that difficulties in managing a case with the law of so many jurisdictions outweigh the benefits derived by consolidating the many small claims together.

CONCLUSION

The foregoing discussion constitutes this court's findings and conclusions regarding Doster's motion for class certification. Doster fails to satisfy the requirements of adequacy of representation, predominance, and superiority. Thus, its motion for class certification was denied.

In addition,

IT IS ORDERED that Doster's motion for reconsideration of the denial of class certification (Doc. 68) is granted and this court's earlier decision is reconsidered. However, upon reconsideration, the decision denying certification stands.

Dated at Milwaukee, Wisconsin, this 17th day of June, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE

44